William Albert Belcher, Jr., and Nell Vandergrift Belcher, Trustee, et al. [1] v. Commissioner. Belcher v. Commissioner
Docket Nos. 83206, 83208-83211.
United States Tax Court
T.C. Memo 1965-1; 1965 Tax Ct. Memo LEXIS 330; 24 T.C.M. (CCH) 1; T.C.M. (RIA) 65001; January 8, 1965
*330 1. Allendale tract was not held by the Belcher partnership primarily for sale to customers in the ordinary course of its trade or business in 1953, and, to the extent of their distributive shares thereof, gain on the sale of certain parcels therefrom by the partnership was taxable as capital gain rather than ordinary income to the partners. 2. Partnership was in the business of selling timber in 1953 and timber sold by the partnership to the Belcher corporation in 1953 was held primarily for sale to its customers in the ordinary course of its trade or business. Partners' distributive share of the gain on the sale thereof was taxable as ordinary income rather than capital gain. Applicability of sec. 117(k)(2), I.R.C. 1939, to the above sales, argued for the first time on petitioners' reply brief, not determined because raised too late. Issue also decided against petitioners by Court of Appeals in refund cases involving prior and subsequent years. 3. In refund proceedings in which only one partner, Abernathy, was a party with respect to this issue, District Court decided that partnership's repurchase of property at foreclosure sale was a taxable event in 1954, when right of redemption *331 was acquired, rather than 1953 when property was repurchased at foreclosure sale, and resulted in gain to partnership in 1954 rather than 1953. Held, respondent barred by collateral estoppel from relitigating issue with Abernathy. Held, further, respondent not barred by res judicata or collateral estoppel from relitigating issue with regard to partners other than Abernathy. Held, further, the mortgage foreclosure did not result in a taxable event until 1954 when the partnership dismissed its suit for a deficiency judgment and acquired the installment purchaser's right of redemption. 4. Additions to tax under sec. 293(a), I.R.C. 1939, determined not to be due for the year 1953. Erle Pettus, Jr., Seventeenth Floor, Twenty-One Twenty-One Bldg., Birmingham, Ala., for the petitioners. Ford P. Mitchell, for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: In these consolidated proceedings respondent determined deficiencies in petitioners' income tax and additions to tax under section 293(a), I.R.C. 1939, [2] for the taxable year 1953, as follows: Docket
Addition to tax
No. [1] *332 Petitioner
Deficiency
sec. 293(a)
83206
William Albert Belcher, Jr. and Nell Vandergrift
Belcher, Trustee
$ 22,863.75
83208
Van Elam Belcher and Nell Vandergrift Belcher,
Trustee
22,863.75
83209
W. A. Belcher and Nell V. Belcher
261,901.26
$13,095.06
83210
James R. Abernathy, Jr., and Mary B. Abernathy
18,346.08
83211
Katherine Ann (Anne) Belcher and Nell Vander-
grift Belcher, Trustee
22,863.75
In amendments to his answers, respondent claimed increased deficiencies for the taxable year 1953 as follows: Docket
Increased deficiency
No.
in income tax
83206
$ 3,170.43
83208
3,170.43
83209
61,552.39
83210
3,062.98
83211
3,170.43
The issues for decision are as follows: (1) Whether the profit from the sale of certain real property in the Allendale tract by the Belcher Land & Timber Co., a partnership in 1953, is taxable as ordinary income or capital gain. (2) Whether the proceeds from the sales of timber by the Belcher Land & Timber Co. during 1953 are taxable as ordinary income or capital gain. (3) Whether the Belcher Land & Timber Co. realized taxable income in the year 1953 upon its reacquisition of 581.76 acres of land by foreclosure sale in 1953. (4) Whether W. A. Belcher and Nell V. Belcher, petitioners in docket No. 83209, are liable for additions to tax under section 293(a) for the taxable year 1953 for negligence or intentional disregard of rules and regulations. Other issues raised by the pleadings *333 have been abandoned or conceded by the parties. General Findings of Fact The parties entered into and filed as a part of the record in this case an extensive stipulation of facts. The facts so stipulated are found as stipulated and are incorporated herein by reference. Related below are only those findings of fact deemed pertinent to the issues remaining for decision. W. A. Belcher and Nell V. Belcher are husband and wife, living in the vicinity of Birmingham, Ala. They are the parents of petitioners William Albert Belcher, Jr., Van Elam Belcher, Katherine Ann Belcher, and Mary B. Abernathy, the latter being the wife of James R. Abernathy, Jr. W. A. Belcher and Nell V. Belcher, and James R., Jr., and Mary B. Abernathy filed joint income tax returns, and each of the other individual petitioners filed individual income tax returns, all on a cash basis, for the calendar year 1953 with the district director of internal revenue at Birmingham, Ala. Belcher Land & Timber Co. is a partnership, hereinafter referred to as the partnership, created on August 1, 1946, and at all times subsequent thereto has been a valid and subsisting partnership composed of the following partners with the following *334 interests therein: Percent
William Albert Belcher
34
Nell Vandergrift Belcher
34
Nell Vandergrift Belcher as trustee
for: Mary Ernestine Belcher Abernathy
8
William Albert Belcher, Jr.
8
Van Elam Belcher
8
Katherine Ann Belcher
8 The trustee has made annual distributions of the partnership income received to each beneficiary. The partnership filed a partnership return of income for the calendar year 1953 with the district director at Birmingham. Its principal business activity was stated on the return to be real estate and timber. W. A. Belcher Lumber Co., Inc., hereinafter referred to as the corporation, was also organized on August 1, 1946, and at all times subsequent thereto has been a valid and subsisting corporation. The stock of the corporation is held by the same persons and in the same percentages as are the interests in the partnership. The partnership and the corporation succeeded to the various assets of W. A. Belcher Lumber Co., a partnership created in 1941 to engage generally in the lumber business, which was dissolved in 1946. The corporation took over the operating assets of the dissolved successor partnership, consisting of the lumber manufacturing plant, vehicles, etc., while *335 the partnership took over the timberlands which comprised in excess of 50,000 acres in various counties in Alabama, including the 700-acre Allendale tract hereinafter mentioned. After succeeding to the interests of the dissolved partnership, the new partnership acquired additional timberlands, in fee and as lessee. During the years 1950 to 1955, inclusive, the partnership sold timber to the corporation, which cut the timber and manufactured it into lumber. In 1946, Belcher Building Corp., hereinafter referred to as Building, was organized to develop land, build houses for sale, and deal in real estate. The stock of the corporation was issued 249 shares to Creel Investment Co., Inc., 1 share to E. C. Creel, 250 shares to W. E. Armstrong, all unrelated to W. A. Belcher, and 250 shares to W. A. Belcher. The stockholdings remained the same until 1954 when W. A. and Nell V. Belcher acquired all the outstanding stock held by the other stockholders. The notices of deficiency, which form the bases of these proceedings, covered the years 1950 through 1955 for each of the taxpayers, but the year 1953 is the only year here involved. All of the adjustments made to the taxable income of the individual *336 petitioners herein for 1953 resulted from adjustments to the partnership income for 1953, which were in turn reflected in the partners' distributive shares of the partnership income. All of the individual petitioners herein paid the deficiencies for the years 1950 and 1951 and filed claims for refund thereof. James and Mary Abernathy also paid the deficiencies for the years 1952, 1954, and 1955 and filed claims for refund. Upon denial of the claims for refund, suits were filed by each of the taxpayers in the United States District Court for the Northern District of Alabama to recover the taxes alleged to have been illegally assessed, the Abernathys filing one complaint for the years 1950 and 1951, and a separate complaint, designated Civil Action No. 9640, for the years 1952, 1954, and 1955. All the cases were consolidated for trial in the District Court. From unfavorable rulings on issues involved in each of the tax years before the Court the Commissioner [3] appealed to the United States Court of Appeals for the Fifth Circuit, and from an unfavorable ruling on an issue involved in the years 1954 and 1955 the Abernathys appealed to the same Court of Appeals, which affirmed the judgment *337 of the District Court in part and reversed and remanded those judgments in part. Further details of those proceedings will be related in our consideration of the specific issues here involved. Issues similar to those here involved, but relating to years before and after 1953, were considered and decided by the courts in the refund proceedings referred to above, but of course the year 1953 was not involved in any of those proceedings; which has led to the rather unusual situation facing this Court in these proceedings, which involve only the year 1953. The citations to the refund proceedings in the District Court and the Court of Appeals are: Belcher v. Patterson, an unreported case ( N.D. Ala. 1960, 6 A.F.T.R 2d 60-5202, 60-2U.S.T.C. par. 9733). Patterson v. Belcher, 302 F. 2d 289 (C.A. 5, 1962). On remand, Abernathy, Jr. v. Patterson, an unreported case ( N.D. Ala. 1963, 12 A.F.T.R. 2d 63-6048, 63-2U.S.T.C. par. 9678). The parties have stipulated that the parties in those proceedings are the same as those herein. Issue I - Sale of Land *338 in Allendale Tract Findings of Fact The predecessor partnership acquired the Allendale tract in 1943. It contained approximately 700 acres and was located not far from Birmingham, on the road to Bessemer. Part of this land had been used as farmland from which rents were collected from tenant farmers. The W. A. Belcher homeplace had once been a part of the Allendale property. From 1946 through 1955 the partnership sol 1 parcels of the Allendaie tract to various purchasers, including Building, as follows: Number
Gross sales
Total
Year
of sales
Acres sold
price
gain
1946
1
$ 53,490
$ 6,455.56
1947
0
1948
2
13.5 and a lot
10,750
3,200.00
200feet X 300feet
1949
2
21.59
15,590
6,686.00
1950
3
[1] 21.756
87,024
73,970.00
1951
2
7.1074
28,420
24,155.50
1952
1
1,000
2,500.00
1953
1
31,800
27,030.00
1954
9
41,510
10,760.00
1955
5
[1] 199,600
54,470.50
In addition, on July 15, 1950, the partnership sold 581.76 acres of the Allendale tract to Atlanta Highway Estates, Inc. (hereinafter referred to as Atlanta), for a total consideration of $727,200, leaving about 66.8 acres of the tract *339 remaining in the hands of the partnership. This sale was an installment sale secured by a mortgage on the property. Atlanta proceeded to develop and subdivide parts of the property, but defaulted in its payments in 1953. The mortgage was foreclosed and the remaining portion of the property was sold in 1953. The partnership bought the property at the foreclosure sale for $500,000. After the partnership acquired Atlanta's right of redemption in 1954, the partnership began developing and selling additional parcels of the Allendale tract. In 1953 the partnership sold 7.95 acres of the Allendale tract to Building, realizing a gain of $27,030 thereon. This land was undeveloped at the time and had been farmed on. However it was near other property which had been developed as a residential area. The partnership also sold other parcels of realty it owned in 1953. None of the partners had licenses to sell real estate in 1953 and the partnership did not employ salesmen to sell its land, nor did it advertise the property for sale or list it with brokers for sale. Sales were made when prospective purchasers contacted the Belchers. The partnership did not engage in any of the normal real estate *340 development or sales activities in 1953 or for several years prior thereto. After acquiring the 7.95 acres, Building developed and subdivided it for residential use and built houses thereon. While W. A. Belcher owned a one-third interest in Building in 1953, he was not active in the management of that company. The stockholders turned the management of the company over to an employed active manager. During 1953 prior to the default by Atlanta the partnership also received payments on the installment notes evidencing the purchase price of the 581.76 acres of the Allendale tract sold to Atlanta in 1950. The parties have stipulated that the gain included in these payments was taxable as long-term capital gain, but in his notice of deficiency respondent determined that the 7.95 acres of the Allendale tract sold by the partnership to Building in 1953 was property held primarily for sale to customers in the ordinary course of its business and hence was not a capital asset under section 117(a). The gain on this sale was therefore determined to be ordinary income. In the refund proceedings mentioned above the jury, in response to a special interrogatory, found that the Allendale tract was not *341 held by the partnership primarily for sale to customers in the ordinary course of its trade or business during the years 1950-52, but that it was so held during the years 1954 and 1955. Judgment was entered by the District Court in accordance with this finding of fact by the jury (and other findings and conclusions of the jury and court on other issues) presumably taxing the profit on sales from the Allendale tract as capital gain in 1950-52, and as ordinary income in 1954 and 1955. The Commissioner appealed each of the cases on the timber sales issue and appealed Civil Action No. 9640 on the issue of the year in which the mortgage foreclosure constituted a taxable event, and the Abernathys filed a cross-appeal in Civil Action No. 9640 charging error in the District Court's refusal to direct the jury to find that the Allendale tract was not held by the partnership for sale to customers in the ordinary course of its trade or business in the years 1954 and 1955. On appeal the Court of Appeals for the Fifth Circuit sustained the jury verdict for the years 1954 and 1955. The Allendale tract was not held by the partnership for sale to customers in the regular course of its trade or business *342 in the year 1953. Opinion The burden of proof on this issue is on petitioners. We think the preponderance of the evidence supports their position. The evidence indicates that the Allendale tract was acquired by the predecessor partnership in 1943 for investment purposes. It was used principally for farming at that time and the present partnership did nothing to change the character of its use until 1954. Sporadic sales of parcels of the tract were made by the partnership from time to time from 1946 to 1954, but neither the partnership nor any of the partners engaged in activities normally associated with the real estate business prior to 1954. In 1950 most of the remainder of the Allendale tract was sold as one parcel to Atlanta. The Commissioner has not disputed that this was a sale of a capital asset - in fact the parties stipulated that it was in the District Court and have stipulated in this case that the proceeds from that sale received in 1953 are taxable as capital gain. There is no evidence of any change in the character of the property in the hands of the partnership from 1950 until 1954. The jury found in the refund proceedings that the Allendale tract was not held by the *343 partnership primarily for sale to customers during the years 1950-52. The evidence presented here indicates there was no change in the partnership's activities with respect to this property, or in its real estate activities generally, during 1953. In its opinion the Court of Appeals said: The taxpayers' contention that the property was originally purchased in 1943 as an investment is not persuasive of its subsequent intent and use after reacquisition in the mortgage foreclosure. While property may at one time be held for investment purposes, if the character of the business changes or the intent of the partners changes, the property could subsequently be found by reasonable men to be held primarily for sale to customers in the ordinary course of business. [302 F. 2d 289, 297-298.] It seems rather clear from the entire discussion of this issue in the opinion of the Court of Appeals that the court was of the opinion that the purpose and intent of the partners with respect to this property changed after the partnership had reacquired the property in the foreclosure sale and had acquired Atlanta's right of redemption in 1954 and thereafter began developing the property and selling lots *344 therefrom directly to the public. The evidence before us indicates that the intent and purpose of the partnership with respect to this property did not change from that of investment prior to 1954 and we have found as a fact that the Allendale tract was not held by the partnership primarily for sale to customers in the ordinary course of its trade or business in 1953. Consequently we conclude that the 7.95 acres of the Allendale tract sold by the partnership to Building in 1953 were capital assets in the hands of the partnership and the gain thereon is taxable as capital gain to the partners. Issue II - Timber Sales Findings of Fact From its inception and through the year in question, the partnership acquired various parcels of realty which were categorized as timberland in that such land had on it unharvested trees which were prime timber stock. In addition, it held leases to timberland and contractual rights to cut certain timber standing on the land of others. During the years 1950 to 1955, inclusive, the partnership made the following sales of timber to the corporation: Fair market
Footage
Sales price
value of timber
(million
of all
held over 6
board
lumber sold
months and sold
Year
feet)
to corporation
to corporation
1950
15.4
$369,432.27
$314,000.00
1951
15.1
522,895.53
461,000.00
1952
14.4
495,257.06
435,000.00
1953
16.1
[1] 439,613.90
331,312.14
1954
12.2
252,678.20
158,596.66
1955
16.5
512,222.71
183,000.00
*345 During the period 1950 through 1955, the partnership sold the following timber to customers other than the corporation: Timber held
Timber held
by partnership
by partnership
for more than
for less than
Year
6 months
6 months
1950
$ 2,148.45
1951
2,196.69
1952
3,552.32
1953
1954
$ 7,735.00
1955
13,680.00
2,739.05
Total
$21,577.46
$10,474.05
During this same period the partnership purchased timber in the following amounts: Number
of pur-
Footage (board
Year
chases
feet)
1950
16
5,838,194
1951
25
10,555,212
1952
49
4,779,899
1953
59
8,895,932
1954
46
20,611,667
1955
42
16,349,296
After the business and assets of the predecessor partnership were taken over by the partnership and the corporation in 1946, the partnership sold most of its timber to the corporation, and during 1953 the partnership sold timber only to the corporation. The timber sold to others during 1950-52 consisted of culled timber not suitable for use by the corporation, which was sold to others for making charcoal, and to clean up the property. For this reason it was not necessary for the partnership to employ salesmen or brokers, or to engage in other *346 selling activities. There was no written contract between the partnership and the corporation as to timber it would purchase or as to timber it actually purchased. Instead there existed a loose oral agreement or "verbal contract" depending upon the needs of the corporation. Under this arrangement, the corporation employed lumberjacks who would go on the fee lands or on leased land of the partnership and cut its requirements of timber. The partnership billed the corporation biweekly for timber sold, and payment was received from the corporation at various times during the year. For the year in question, the partnership reported the gain from the sale of timber to the corporation in the amount of $184,302.57 as long-term capital gain. This represented its only sales of timber during the year. Petitioners reported their distributive shares of these gains as capital gain received from the partnership on their individual returns for the year. Neither the partnership nor the partners elected on their returns to have section 117(k)(1) apply. In his notice of deficiency for 1953 respondent did not determine that the proper gains on the sale of timber was not capital gain but did determine *347 that the sales price to the corporation was excessive and that the excess was taxable as a dividend to the partners. Respondent also determined that a larger part of the gain on the sale of timber was from timber held for less than 6 months than as reported by the partnership and therefore reallocated the allowable gain between short-term and long-term capital gain. Petitioners challenged this determination and reallocation for each of the years 1950-52, and 1955, [4] in the refund proceedings. Prior to trial in the District Court, the Commissioner filed a motion for setoff in each of the cases seeking a setoff against whatever recovery the plaintiff in those cases might receive for reasons set out therein. The reasons, in summary, were that the partnership had reported income from the sale of logs and timber, which it claimed was entitled to long-term capital gains treatment under either section 117(k)(2) of the 1939 Code or section 631(b) of the 1954 Code; that Commissioner's agents had incorrectly assumed that such sales constituted gain from the sale of a *348 capital asset held for more than 6 months under the provisions of the above sections; that such sales did not constitute a disposal of timber with a retained economic interest as required by those sections; that said timber and logs were not held for more than 6 months before the date of disposal; and that neither the partnership nor the partners had elected to come under the provisions of section 117(k)(1) of the 1939 Code or section 631(a) of the 1954 Code, as required therein. The District Court made its own finding of fact as follows: 9. The sales of timber made for each of the years 1950 to 1955, inclusive, by the Belcher Land and Timber Company, a partnership, to W. A. Belcher Lumber Company, a corporation, were not made of property held primarily for sale to customers in the ordinary course of trade or business of Belcher Land and Timber Company, a partnership. In its conclusions of law the District Court concluded: 4. The sales of timber made by the Belcher Land and Timber Company, a partnership, to W. A. Belcher Lumber Company, a corporation, during the years 1950, 1951, 1952, 1954 and 1955, of timber held for more than six months are entitled to capital gain treatment under *349 the appropriate provisions of the Internal Revenue Code of 1939 or 1954, as the case may be. No mention was made either in the special interrogatories submitted to the jury or in the District Court's opinion of the applicability of sections 117(k) of the 1939 Code or 631 of the 1954 Code. The Commissioner appealed the judgment of the District Court on the timber sales issue in all cases. By order of the Court of Appeals this issue on timber sales was limited to: (a) Whether the gain on sales of timber from Belcher Land and Timber Company, a partnership, to W. A. Belcher Lumber Company, Inc., a corporation during the tax years involved, constituted capital gain or ordinary income to the Belcher Land and Timber Company, a partnership; In argument on appeal, petitioners apparently contended that the issue of whether the timber held by the partnership was held primarily for sale to customers in the ordinary course of its trade or business was not raised in the court below and was not property before the Court of Appeals for determination. For reason set out in its opinion, see 302 F. 2d 289, 291-292, the Court of Appeals held that the issue was properly raised and adjudicated below and *350 was properly before the appellate court. The appellate court went on to conclude that the District Court erred in its ultimate determination that the sales of timber for the years in question were not of property held primarily for sale to customers in the ordinary course of trade or business, and that the sale of timber did not constitute sales of capital assets under section 117(a)(1) of the 1939 Code. In the course of its opinion on this issue, after discussing the partnership's "long history of constant, continuous and substantial timber sales throughout the years 1950 through 1955," it said, at page 294: On the basis of the foregoing facts, if the sales of timber made by the partnership did not consist of timber held primarily for sale to customers in the ordinary course of trade or business, it is difficult to conceive for what other purpose the timber was held. The fact that most of the timber was sold to the corporation does not alter the fact that the primary business of the partnership was selling timber. There is nothing in the statute to provide that sales to a restricted number of customers are not to be considered as sales to customers. * * * A single vendee may be a *351 customer within the meaning of Section 117(a)(1). Jantzer v. Commissioner, supra 284 F. 2d 348 (C.A. 9, 1960). Earlier in its opinion, at pages 292-293, the court related that gains from the sale of timber constitute capital gain if the timber is a capital asset as defined in section 117(a) of the 1939 Code, or if the transactions whereby the gain is realized comply with the specific terms of section 117(k)(1) or (2). With reference to section 117(k)(2) the court said: We find that Section 117(k)(2) is inapplicable here since there was no "disposal" of timber under a "contract by virtue of which the owner retains an economic interest in such timber." See Jantzer v. Commissioner, 284 F. 2d 348 (9th Cir. 1960). The appellees assert no rights under Sections 117(k)(1) or 117(k)(2), therefore no discussion is deemed necessary. Prior to the beginning of the trial in these proceedings respondent filed an amendment to his answers claiming in the alternative that the partnership income from timber sales in 1953 constituted ordinary income and not capital gain because the timber was held by the partnership primarily for sale to customers in the ordinary course of its business and therefore *352 was not a capital asset, and because neither section 117(k)(1) nor 117(k)(2) applied. Petitioners filed no reply to this amended answer. In his opening statement at the trial of this case, counsel for respondent stated that respondent was abandoning the position he had taken in the notice of deficiency with reference to the timber sales and would reply on the position set forth in his amended answer. Opinion Inasmuch as respondent first claimed in his amended answer that the timber sold by the partnership was property held primarily for sale to customers in the ordinary course of its trade or business and hence the sales did not qualify for capital gains treatment under section 117(a), we assume the burden of proof on this issue is on respondent. Rule 32, Tax Court Rules of Practice; Sheldon Tauber, 24 T.C. 179 (1955); Thomas Wilson, 25 T.C. 1058 (1956); W. H. Weaver, 25 T.C. 1067 (1956). However, in view of our approach to this issue we do not think the burden of proof is of much concern. For the first time in their reply brief filed herein, petitioners argue that the timber sales are entitled to capital gains treatment under section 117(k)(2) of the 1939 Code. We will discuss *353 this later. Petitioners claim that the issue of whether the partnership was in the business of selling timber so that the timber did not qualify as a capital asset under section 117(a) was not properly before the lower court or the jury in the refund proceedings and hence the conclusions of the Court of Appeals on this issue for the years immediately preceding and succeeding the year 1953 here in issue should have no bearing on our consideration of this issue for the year 1953. This argument was apparently made directly to the Court of Appeals in the refund proceedings and that court concluded that the issue was properly before it. The District Court judge specifically found as a fact that the partnership did not hold the timber for sale to customers for the years 1950 through 1955, but on the record made in the District Court the Court of Appeals reversed finding that the partnership was in the business of selling timber and that the timber was held by the partnership primarily for sale to customers in that business. It is clear from the opinion of the court that it was considering the activities of the partnership with respect to timber sales as being consistent throughout the period *354 1950-55. So despite the fact that the taxable year 1953 was not before the courts in the refund proceedings, it would require considerable evidence of a change in the purpose, intent, and activities of the partnership with respect to timber sales in the year 1953 alone to convince us, to say nothing of the Court of Appeals, that the partnership was any less in the business of selling timber in 1953 than it was in the years 1950-52 and 1954-55. The record presented to the Court of Appeals in the refund proceedings has been made a part of the record in these proceedings. We have examined both the evidence contained therein and the additional evidence presented at the trial of this case on this issue and we are convinced therefrom that the partnership was in the business of selling timber in 1953 and that the timber it sold in that year was held by it primarily for sale to customers in the regular course of its business. It did not constitute a capital asset within the meaning of section 117(a) of the Code. The only additional evidence presented by petitioners on this point in the trial of this case was directed at showing that petitioner sold all of its timber usable for manufacturing *355 to one buyer, the corporation, and that its sales to other buyers were of culled timber only, and incidental. It is clear from the opinion of the Court of Appeals that this argument was given consideration in its determination of this issue and was not convincing. Under the circumstances of this case, this factor does not change our conclusion on this point. For the first time in their reply brief, petitioners claim that they are entitled to capital gains treatment on their gains from the sale of timber under sections 117(j) and 117(k)(2) of the 1939 Code. [5] *357 *358 In general, section 117(j)(2) provides that if the recognized gains from the sale or exchange of property used in the trade or business (plus those from involuntary conversions) exceed the recognized losses from such sales or exchanges (and conversions), such gains shall be considered sales or exchanges of capital assets held for more than 6 months. Section 117(j)(1) defines "property used in the trade or business" as specifically including timber with respect to which subsection (k)(1) or (2) is applicable. Section 117(k)(2) provides that in the case of disposal of timber, held for more than 6 months prior to such disposal, by *356 the owner thereof under any form of contract by virtue of which the owner retains an economic interest in such timber, the gain on such disposal shall be considered as gain upon the sale of such timber. By the interplay of these two sections, if timber held for more than 6 months is disposed of by the owner thereof under a contract by virtue of which the owner retains an economic interest in the timber, the excess of gains over losses incurred in these transactions and other transactions described in section 117(j)(2) is treated as long-term capital gain. Petitioners now claim that the timber sales of the partnership qualify for capital gains treatment by virtue of section 117(k)(2). This Court has consistently held that issues attempted to be raised for the first time by brief will be disregarded. Eleanor C. Shomaker, 38 T.C. 192, 201 (1962), and cases cited therein. Strictly speaking this issue of the applicability of section 117(k)(2) was not required to be raised by petitioners in their petitions because it was not until respondent filed his amended answers that he took the position that the partnership timber sales did not qualify for capital gains treatment. However, in his amended answers respondent did allege that the timber sales did not qualify for capital gains treatment not only because they were not sales of capital assets under section 117(a) but also because there was no election under section 117(k)(1) and the partnership did not dispose of the timber *359 under a contract by virtue of which the owners retained an economic interest in such timber. This clearly raised an issue with respect to section 117(k)(2), but petitioners nowhere denied the allegations with respect thereto made in respondent's amended answer. So far as we can determine there was no additional evidence introduced at this trial directed to this point. Certainly no evidence was introduced to indicate that the form or type of contract under which the partnership sold or disposed of its timber during the year 1953 was any different than the form or type of contract by virtue of which it had sold or disposed of its timber in 1950-52 and 1954-55. Both parties tried this case and argued on original briefs as though the only question on the timber sales issue was whether the timber sold by the partnership was held primarily for sale to customers in the ordinary course of its trade or business. In fact, in introducing this discussion of section 117(k)(2) in their reply brief, petitioners state parenthetically: (Petitioners did not insist upon the applicability of Sec. 117(k)(2) either in the United States Court of Appeals for the Fifth Circuit nor in the initial brief in this *360 Court because of the belief - demonstrated herein to be erroneous - that the Ah Pah Redwood case foreclosed the applicability of that subsection.) We must decline to consider this question argued for the first time on reply brief. See Marc Eidlitz & Son, Inc., 18 B.T.A. 187 (1929). Even if we were to consider the question, we believe we would be required to hold against petitioners under the peculiar circumstances here present. Somewhat similar to the situation here, in the refund cases the question of whether either section 117(a) or section 117(k)(1) and (2) were applicable was raised for the first time by respondent in a motion for setoff filed after the pleadings were in but prior to the trial in the District Court. The District Court found that the timber sold by the partnership during the period 1950-55 was not held primarily for sale to customers in the regular course of its trade or business, and held that the timber qualified as capital assets under section 117(a) and the gains on the sales thereof should be taxed as capital gains for the years involved. No mention was made of the factors involved in section 117(k)(2). On appeal to the Court of Appeals for the Fifth Circuit, *361 that court entered an order that one of the issues on appeal was whether the gain on sales of timber by the partnership to the corporation constituted capital gain or ordinary income to the partnership. No reference was made to any particular code sections. Petitioners apparently did not argue the applicability of section 117(k)(2) to the Court of Appeals, but that court evidently thought that a determination with respect to the applicability of section 117(k)(2) was necessary for a final disposition of the capital gains issue as stated in its order because the court specifically found in its opinion "that Section 117(k)(2) is inapplicable here since there was no 'disposal' of timber under a 'contract by virtue of which the owner retains an economic interest in such timber'," citing Jantzer v. Commissioner, 284 F. 2d 384 (C.A. 9, 1960). We must accept this as a conclusion by the Court of Appeals that the arrangement under which the partnership sold its timber to the corporation, during the years 1950-52 and 1954-55 at least, did not qualify under section 117(k)(2). While it is true that the year 1953 was not before the Court of Appeals, it is obvious from the opinion of that court *362 that it took into consideration the partnership's course of dealing with its timber throughout the period 1950-55. Furthermore, no evidence has been presented to us that the oral arrangement under which the partnership sold timber to the corporation in 1953 was any different than the arrangement under which it sold the timber during the other years from 1950 through 1955; indeed the evidence we have indicates that it was the same. If we were to consider this question here it seems pretty clear what our answer would necessarily be under the circumstances. We think petitioners' change of heart with respect to the applicability of section 117(k)(2) has come too late to be availed of in this case. Issue III - Gain on Foreclosure of Atlanta Highway Estates, Inc., Mortgage Findings of Fact As previously mentioned under issue I, the partnership sold 581.76 acres of the Allendale tract to Atlanta in 1950 for $727,200. This was an installment sale with $53,236 being paid in cash at the time of the sale and the unpaid portion of the purchase price ($673,964) being evidenced by a promissory note secured by a mortgage on the property. Atlanta began development of the property for residential *363 purposes and sold various lots therefrom, obtaining releases of such lots from under the mortgage as payments were made on the note. Atlanta defaulted in its payments in 1953 and the partnership forclosed under the mortgage and caused the remainder of the property to be sold thereunder. The amount paid on the note up to the date of foreclosure, including the downpayment, was $124,439.95. The partnership bid the property in at the foreclosure sale for $500,000 and the property was conveyed to the partnership in 1953 by a foreclosure deed dated February 14, 1953. Subsequent thereto a business concern entered into negotiations to purchase a part of the property but the negotiations terminated when the partnership was unable to obtain from Atlanta a release of its right of redemption. Under Alabama law a mortgagor has a statutory right of redemption within 2 years from the date of foreclosure unless sooner extinguished by voluntary act of the mortgagor. See Ala. Code tit. 7, sec. 727 (1940). On June 2, 1953, the partnership filed suit against Atlanta for a deficiency judgment in the amount of $180,558.75 as the balance due on the mortgage note, plus interest. Under date of July 26, 1954, *364 the mortgagor transferred to the partnership by quitclaim deed "all of its right of redemption in and to the property acquired by the grantee herein by foreclosure of the Allendale mortgage." The deed was delivered with the understanding and agreement that in consideration thereof the deficiency judgment suit would be settled and dismissed. As a result thereof the entire liability under the installment obligation was completely satisfied, extinguished, and settled in an amount less than the face value of the obligation. In its return of partnership income for 1950 the partnership elected to report the gain on the sale of the Allendale tract on the installment basis, which it did with respect to the payments received during the years 1950-52 and during the year 1953 prior to the foreclosure sale. In its return for 1953 the partnership did not report any gain from the foreclosure of the Allendale tract, but instead, increased the cost basis of the property by the amount bid at the foreclosure sale. It subsequently used this increased basis in computing its gains on the sale of parcels from the Allendale property. Petitioners reported no gain on the foreclosure as a part of their distributive *365 share of the partnership income for the year 1953. In his notices of deficiency respondent determined that the partnership realized a taxable gain from the foreclosure sale in 1953 in the amount of $414,566.56 and included this in the ordinary income of the partnership, and of the partners, for the year 1953. In their petitions to this Court petitioners claimed error in respondent's determination above, primarily on the theory that while in form the transaction with Atlanta in 1950 was a sale with a mortgage securing the purchase price, it was in substance merely an option arrangement whereunder Atlanta was to become the true owner of only such portions of the property as it actually paid for, and that the foreclosure was in reality simply a method of terminating the option arrangement; and alternatively, that because the mortgagor retained a right of redemption throughout the year 1953, there were no tax consequences of the foreclosure in 1953. Inasmuch as respondent had determined no additional tax as a result of the foreclosure for any of the years 1950-52 and 1954-55, there was no issue raised directly with respect thereto in the complaints filed by petitioners in the refund cases. *366 However, in count 5 of their complaint filed in Civil Action No. 9640, petitioners Abernathy claimed error in the Commissioner's determination of cost of sales of parcels from the Allendale tract in 1955, denying that there was any taxable gain on the alleged foreclosure of the Allendale tract in 1953, but alleging that if there was a taxable gain then the basis of the foreclosed Allendale property should be stepped up to the extent such gain was recognized. At the conclusion of the trial in the District Court, but prior to the filing of the court's opinion, the Commissioner filed a motion for setoff in Civil Action No. 9640 alleging that at the close of the trial it had come to his attention that in the action for redetermination of their tax for 1953 filed in the Tax Court (the instant proceeding) the taxpayers were claiming that the foreclosure was not a taxable event in 1953 but constituted a taxable event in either 1954 or 1955, which, if correct, would result in additional income to the taxpayers for 1954 or 1955 and would offset any refunds they might be entitled to for those years. In its opinion in the refund cases, the District Court made a finding of fact as to the cost *367 basis of the land sold by the partnership in 1955 from the Allendale tract (par. 7). It also made a finding (par. 12) that for purposes of ascertaining the cost basis of sales of certain parcels from the Allendale tract in 1955, the reacquisition of the property through foreclosure in 1953 and the extinguishment of the statutory right of redemption in 1954 had been considered to be a taxable event, but the court declined to determine in which year the taxable event occurred. On appeal the Court of Appeals found that "the District Court's refusal to make a determination of the specific year in which the gain [on foreclosure] constituted a taxable event was error, for in order for there to be a final disposition of this litigation such determination is indispensable. The taxable consequences of this determination should likewise be settled in this litigation." It thereupon reversed the District Court on this issue and remanded it with directions for further proceedings in accordance with the opinion. On remand the District Court concluded that the gain on the Allendale mortgage foreclosure was not taxable in the year 1953 for the reason that the mortgagor had a statutory right of redemption *368 which did not expire for 2 years unless relinquished by the mortgagor prior thereto; that the gain on the mortgage foreclosure was taxable in the year 1954 because the right of redemption was relinquished by the mortgagor in that year; that the gain was capital gain; and that the Abernathys' share thereof should be offset against the amount, if any, which they were otherwise entitled to recover for the year 1954. The Commissioner filed an appeal from this judgment but dismissed the appeal shortly before this case came on for trial. When this case was called for trial petitioners herein filed an amendment to their petitions herein alleging that the final adjudication of the District Court in the refund proceedings that the gain on the foreclosure was not a taxable event in 1953 was binding on all parties hereto and is res adjudicata of the income tax consequences of the foreclosure; and that respondent is estopped from contending in this proceeding that the foreclosure was a taxable event in 1953. Opinion On this issue respondent argues primarily that the decision of the District Court that the taxable event occurred in 1954 and not in 1953 is in conflict with his regulation, sec. 39.44-3(b), *369 Regs. 118, and is clearly erroneous. Petitioners, on the other hand, argue that the decision of the District Court was correct, and further that the Commissioner is estopped from relitigating the issue in this Court by the doctrines of res judicata and/or collateral estoppel. We will first consider petitioners' pleas of res judicata and collateral estoppel because if either of the pleas is sound, this issue may be disposed of here without reaching the merits of the controversy. The doctrine of res judicata is judicial in origin, and the doctrine of collateral estoppel is a more limited application of the same principles. Both rest upon considerations of economy of judicial time and public policy favoring the establishment of certainty in legal relations. Both are to be used with caution. Generally speaking res judicata applies to prevent repetitious suits between the parties and their privies regarding the same cause of action, while collateral estoppel applies where there is a second action between the same parties and their privies upon a different cause of action. Commissioner v. Sunnen, 333 U.S. 591 (1948). For a discussion of the differences between the two doctrines see Commissioner v. Sunnen, supra, *370 and more recently John W. Amos, 43 T.C. 50 (1964). Respondent seeks to avoid application of these doctrines on the ground that the Abernathys alone were parties to Civil Action No. 9640, wherein this issue was decided in the refund actions, and therefore neither res judicata nor collateral estoppel can be invoked in favor of the other taxpayers because they were not parties to the prior action. This is a tacit admission that the doctrine of collateral estoppel applies with respect to the Abernathys. As between the respondent and the Abernathys, all the requirements for the application of the doctrine of collateral estoppel are met and we conclude that respondent is estopped from relitigating this issue with respect to the Abernathys. The situation is somewhat different, however, with respect to the other taxpayers here involved. While they were parties in the consolidated refund proceedings, none of them put in issue in the refund proceedings their tax liabilities for the years 1954 and 1955. Although it would seem that this is a situation in which the doctrine of repose might well be applied because the very same issue based on the very same facts has once been litigated by a court *371 of competent jurisdiction and there has been no intervening change in the law or the legal climate pertinent thereto, we are not convinced that all the requirements for application of collateral estoppel can be said to be present as between respondent and petitioners other than the Abernathys. The other partners were not parties in the only case in which this issue was litigated in the refund proceedings. We also doubt that they could be considered in privity with the Abernathys. Privity, as used in connection with res judicata and collateral estoppel denotes mutual or successive relations to the same property rights. See 33 Words and Phrases, p. 798 et seq. While it is true that the outcome of the issue here involved depends entirely on whether the mortgage foreclosure resulted in recognizable gain to the partnership in 1953 or 1954, and it has been stipulated that all adjustments to the income of the partners for the year 1953 result from adjustments in the partnership income, nevertheless, the other partners derived none of their interests in the partnership from or through the Abernathys, the Abernathys were not representing the other parties or the partnership in that litigation, *372 and the other partners were not bound by the actions of the Abernathys. It is also true that this issue was injected into the refund proceedings for the year 1954 at the instance of respondent and respondent is also the moving party on this issue in this case, but had the decision of the District Court gone the other way it would be difficult to say that the other partners would be collaterally estopped from claiming in this proceeding that the taxable event did not occur in the year 1953. Consequently, because of the admonitions that these doctrines be used cautiously, see James Couzens, 11 B.T.A. 1040 (1928), we are not relying on the doctrines of res judicata or collateral estoppel in reaching our conclusions on this issue with respect to the taxpayers other than the Abernathys. Nevertheless, we think the decision of the District Court is entitled to considerable weight in our consideration of this issue on the merits. That court was specifically directed by the Court of Appeals to determine the year in which the taxable event occurred so that the issue could be put to rest in that litigation, and there is every indication that the District Court gave careful consideration to this *373 issue on remand. The parties were apparently offered an opportunity to present any additional evidence they had on this specific issue and they did file an additional stipulation of facts. We assume that the same legal arguments were made to that court as are made here on the merits. While we must decide the legal issue involved independently of the District Court, we would be inclined to follow the decision of that court in this situation unless we are convinced that it is wrong so that the tax consequences of the event will be applied alike to all of the partners in the partnership and to discourage relitigation of the same issue by the same party under circumstances, which while technically not supporting estoppel, nevertheless seem to us to violate the underlying principles upon which these judicial concepts were based. As stated by the Supreme Court in Commissioner v. Sunnen, supra, "if consistency in decision is considered just and desirable, reliance may be placed upon the ordinary rule of stare decisis." We think this is the situation in which consistency is desirable particularly in view of the fact that respondent injected this issue into the prior proceeding and had the *374 opportunity in that proceeding to appeal the decision of the District Court if he thought it was legally erroneous. [6]
On the evidence presented the District Court found that the mortgagor executed the deed conveying to the partnership the right of redemption with the understanding and agreement that in consideration thereof the deficiency judgment suit would be dismissed and the entire liability under the installment obligation would be completely satisfied, and that complete satisfaction of the installment obligation at less than face value *375 was thereby accomplished in 1954. The District Court thereupon concluded that the gain on the mortgage foreclosure of the Allendale tract was not taxable in the year 1953 for the reason that the mortgagor had a statutory right of redemption which did not expire for 2 years unless relinquished by the mortgagor prior to that time; and that the transfer of the right of redemption in the year 1954 by quitclaim deed from the mortgagor to the partnership resulted in the satisfaction and settlement of the installment obligation at other than face value in 1954 and taxable income to the Abernathys in that year. See Boca Ratone Co. v. Commissioner, 86 F. 2d 9 (C.A. 3, 1936), reversing 31 B.T.A. 1060 (1935); Eggerman Investment Co., 36 B.T.A. 1196 (1937); G.C.M. 19367, 1937-2 C.B. 115. We agree with the conclusion of the District Court that under the facts presented to us, which are the same as found by the District Court, the mortgage foreclosure resulted in taxable income to the partnership, and hence to all the partners, in the year 1954 and not in the year 1953. Respondent has cited us no authority indicating that this conclusion is wrong. Respondent's principal reliance is on section 44(d), I.R.C. 1939, *376 and his regulation, sec. 39.44-3(b), Regs. 118, interpreting that section. Section 44(d) provided in substance that if an installment obligation is satisfied at other than its face value or distributed, transmitted, sold, or otherwise disposed of, gain or loss shall result to the extent of the difference between the basis of the obligation and the amount realized. The above section of the regulations provides that where the vendor returning income on the installment basis reacquires the property sold, gain or loss for the year in which the reacquisition occurs is to be computed upon any installment obligations of the purchasers which are satisfied or discharged upon the reacquisition or are applied by the vendor to the purchase or bid price of the property. Respondent argues that the year of reacquisition was the year 1953 when the property was actually purchased at the foreclosure sale and the purchase price was paid by applying the purchaser's notes thereto. However, it did not become certain until the partnership acquired Atlanta's right of redemption in 1954 that the partnership would actually continue to hold the property. The statute and the regulations referred to above both *377 deal with the gain or loss on the installment obligations which are satisfied or otherwise disposed of. We agree with the conclusion of the District Court that the installment obligations were not satisfied until the right of redemption was transferred and the deficiency judgment suit was dismissed with the agreement that all liability under the installment obligations was satisfied and settled. The statute says nothing about when the gain or loss shall result - only that gain or loss shall result "If an installment obligation is satisfied at other than its face value * * * or otherwise disposed of." Under the circumstances here present we do not think the installment obligations can be said to have been satisfied at other than face value, or otherwise disposed of, until the deficiency judgment suit was dismissed and the right of redemption expired in 1954. Consequently, no gain or loss resulted until 1954. We find nothing in section 39.44-3, Regs. 118, nor in section 1.453-5, Income Tax Regs., which interprets the similar provision in the 1954 Code, which required a conclusion to the contrary. In fact section 1.453-9 provides that the gain or loss resulting from any disposition or *378 satisfaction of installment obligations is recognized in the taxable year of such disposition or satisfaction. If, as we have concluded, the installment obligations were not satisfied until 1954, it would seem that under the regulations no gain or loss should be recognized until 1954. We hold for petitioners on this issue. Issue IV - Negligence Penalty Under Section 293(a) This issue relates to petitioners W.A. and Nell V. Belcher in docket No. 83209 for the year 1953 only. In his notice of deficiency respondent determined that part of the deficiency in tax determined to be due from these petitioners was due to negligence, or intentional disregard of rules and regulations, and asserted the 5-percent penalty provided by section 293(a), I.R.C. 1939. [7] *379 While no specifics were recited in the notice of deficiency, on brief respondent states: If the Court holds that the gain on the foreclosure is a taxable event in 1953, the respondent contends that petitioners W. A. Belcher and Nell V. Belcher are liable for the addition to the tax under the provisions of Section 293(a) of the Code. Since we have held that the gain on the foreclosure sale was not a taxable event in 1953 and since the record reveals no other evidence of negligence or intentional disregard of rules and regulations on the part of these petitioners in reporting their income for 1953, we conclude that no addition to tax for 1953 is due from them under section 293(a). Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Van Elam Belcher and Nell Vandergrift Belcher, Trustee, docket No. 83208; W. A. Belcher and Nell V. Belcher, docket No. 83209; James R. Abernathy, Jr., and Mary B. Abernathy, docket No. 83210; and Katherine Ann (Anne) Belcher and Nell Vandergrift Belcher, Trustee, docket No. 83211.↩
2. All statutory references are to the Internal Revenue Code of 1939 unless otherwise noted.↩
1. Docket No. 83207, which involved W. A. Belcher Lumber Co., Inc., was settled by agreement of the parties. 3. For convenience we will refer to the agent of the Government in both the refund cases and this proceeding as either Commissioner or respondent.↩
1. This is the figure reported in the tax return for that taxable year and is different from that as stated in Patterson v. Belcher, 302 F. 2d 289, 296↩ (C.A. 5, 1962).
1. This stipulated amount is different from that set forth in the opinion of the Court of Appeals, 302 F. 2d 289 at 290↩.
4. This adjustment does not appear to have been made for 1954. The Abernathys alone challenged the adjustments for 1952 and 1955.↩
5. SEC. 117. CAPITAL GAINS AND LOSSES. * * *
(j) Gains and Losses From Involuntary Conversion and From the Sale or Exchange of Certain Property Used in the Trade or Business. - (1) Definition of property used in the trade or business. - For the purposes of this subsection, the term "property used in the trade or business" * * * includes timber * * * with respect to which subsection (k)(1) or (2) is applicable. * * * (2) General rule. - If, during the taxable year, the recognized gains upon sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. * * *
(k) Gain or Loss in the Case of Timber or Coal. - (1) If the taxpayer so elects upon his return for a taxable year, the cutting of timber (for sale or for use in the taxpayer's trade or business) during such year by the taxpayer who owns, or has a contract right to cut, such timber (providing he has owned such timber or has held such contact right for a period of more than six months prior to the beginning of such year) shall be considered as a sale or exchange of such timber cut during such year. * * * (2) In the case of the disposal of timber or coal (including lignite), held for more than 6 months prior to such disposal, by the owner thereof under any form or type of contract by virtue of which the owner retains an economic interest in such timber or coal, the difference between the amount received for such timber or coal and the adjusted depletion basis thereof shall be considered as though it were a gain or loss, as the case may be, upon the sale of such timber or coal. * * *
6. We recognize the dilemma respondent found himself in when the other partners accepted his determinations for the year 1954 and failed to put their tax liability for that year in issue either in the District Court or in this Court, while contesting respondent's determination that they realized income from the foreclosure in 1953 in this Court on the ground that no taxable event occurred until 1954. We also recognize that the partners other than the Abernathys may avoid tax on this gain altogether as a result of the conclusion of the District Court and our conclusion here. However, respondent chose to raise this issue in the Abernathy refund suit.↩
7. SEC. 293. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY. (a) Negligence. - If any part of any deficiency is due to negligence, or intentional disregard of rules and regulations but without intent to defraud, 5 per centum of the total amount of the deficiency (in addition to such deficiency) shall be assessed, collected, and paid in the same manner as if it were a deficiency, except that the provisions of section 272(i), relating to the prorating of a deficiency, and of section 292↩, relating to interest on deficiencies, shall not be applicable.